IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Phillip Cross, ) | |
| ) | Civil Action No. 6:14-47-TLW-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits in October 2010, alleging that he became unable to work on June 9, 2010. The applications were denied initially and on reconsideration by the Social Security Administration. On July 11, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Kathleen H. Robbins, an impartial vocational expert, appeared on April 12, 2012,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on September 28, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on November 18, 2013.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)     The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.
>
> (2)     The claimant has not engaged in substantial gainful activity since June 9, 2010, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)     The claimant has the following severe impairments: ischemic heart disease with myocardial infarction; and a history of crack cocaine abuse, in remission (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except the claimant is able to lift up to 15 pounds occasionally, lift or carry up to 10 pounds frequently; stand or walk for approximately 4 hours in an 8-hour workday; sit for approximately 4 to 6 hours in an 8-hour workday; frequently use upper and lower extremities bilaterally to operate push/pull controls or foot controls; cannot climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, but no more than 4 to 6 steps at a time and with the assistance of a single handrail; frequently balance, occasionally stoop, never crouch, occasionally kneel, and occasionally crawl; must avoid even moderate exposure to excessive vibration, environmental irritants (e.g. fumes, odors, dusts, gases), exposure to poorly ventilated areas, and chemicals, and hazards (e.g., use of moving machinery, exposure to unprotected heights); limited to

occupations which do not involve access to narcotic drugs; and limited to simple, routine, and repetitive tasks.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)     The claimant was born on May 24, 1958, and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. §§ 404.1568 and 416.968).

(10)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)     The claimant has not been under a disability, as defined in the Social Security Act, from June 9, 2010, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456

(4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was born on May 24, 1958, and was 52 years old on his alleged disability onset date (Tr. 145). The plaintiff stopped working in 2009 because his employer laid him off (Tr. 73, 189). When he failed to pay child support, he was incarcerated from March 2010 to September 2010 (Tr. 73, 176). In June 2010, while he was incarcerated, the plaintiff suffered acute cardiac arrest (Tr. 73, 176, 260-61). He was hospitalized at Spartanburg Regional on June 9, 2010, placed on a "code freeze" protocol, and noted to have some renal failure. He also had some anoxic encephalopathy, which improved over the course of treatment. He also was noted to have acute liver dysfunction and hepatitis C (Tr. 260-61). On June 9, 2010, an echocardiogram showed an ejection fraction of less than 25% (Tr. 263, 373). It was noted that the plaintiff had a history of smoking cigarettes

and using crack cocaine (Tr. 266). He underwent cardiac catheterization on June 17, 2010, which showed mild to moderately reduced systolic left ventricular function with regional wall motion abnormality and significant two vessel coronary artery disease involving occlusion of the third marginal branch and mid posterior descending branch of the dominant circumflex (Tr. 562-63). He was released from the hospital on June 28, 2010 (Tr. 260-61). During the plaintiff's 19-day stay at the hospital, his renal function improved remarkably (Tr. 260, 425). In addition, his ejection fraction increased to 40% to 45% by the time he was discharged (Tr. 260, 425). At discharge, Alejandro Lopez, M.D., prescribed Coumadin, aspirin, Carvedilol, Lasix, Lisinopril, potassium chloride, Amlodipine, and nitroglycerine, and instructed the plaintiff to follow up with cardiology in approximately ten weeks (Tr. 261).

On August 30, 2010, the plaintiff saw Upstate Lung and Critical Care Specialists for a followup and complained of dyspnea, chest pain, and cough. Treatment notes indicated that the plaintiff had quit smoking since he was discharged in June, but had smoked a pack of cigarettes a day for years (Tr. 250). He reported that his shortness of breath varied from day to day. He could walk 50 feet on level ground but could not go up a flight of stairs without stopping. He had an occasional sensation of smothering and daily sensation of palpitations. Pulmonary function testing was normal, as was the chest x-ray. His dyspnea (shortness of breath) was felt to be due to his significant heart failure, and he was prescribed albuterol for questionable chronic obstructive pulmonary disease ("COPD") (Tr. 414-17).

On September 17, 2010, the plaintiff saw Dr. Lopez at Cardiology Consultants. He was noted to have an occluded third marginal branch and posterior descending branch. He reported constant chest soreness and two syncopal episodes since his release from the hospital. He was compliant with medications. A Holter study and echocardiogram were ordered (Tr. 256-57, 435-37). An echocardiogram performed on September 22, 2010, showed an ejection fraction of 40-45% with severe inferior wall

hypokinesis (Tr. 253, 274, 430). Holter monitoring was initiated on September 22, 2010, and showed frequent premature ventricular contractions (Tr. 272, 428). However, the plaintiff's intermittent atypical chest pain was not associated with dysrhythmia, he never had pauses more than 1.6 seconds, his QRS was normal, he did not have sustained arrhythmia, and his minimum heart rate was considered physiologic (Tr. 432). Similarly, his heart exam revealed a regular rhythm, normal apex impulse location, and normal heart sounds (Tr. 433).

An October 29, 2010, CT scan of the plaintiff's chest revealed that his lungs were essentially clear with only some minor opacity anterior to the left hilum (of little clinical significance) with pleural effusions resolved (Tr. 420, 451). The progress notes revealed, however, that the plaintiff had begun smoking cigarettes again (Tr. 418).

The plaintiff returned to Upstate Lung on November 5, 2010. He complained of headache, blurred vision, nausea, and had swelling in his hands and feet. He reported that he could not do strenuous exercise because he tired quickly. He was having some lower extremity edema and some wheezing. His cardiovascular auscultation revealed a regular rate and rhythm, normal S1 and S2, no murmur, no rub, and no gallup. He was given clonidine and Lisinopril for high blood pressure and told to follow up with cardiology (Tr. 418-20).

On November 8, 2010, the plaintiff saw David G. Ike, M.D., at Cardiology Consultants for followup. He was prescribed Lisinopril, aspirin, nitroglycerin, Coreg, and Ventolin (Tr. 422-23).

The plaintiff went to the emergency room on November 23, 2010, for chest pain with increased blood pressure. He was unable to afford one of his medications. His chest pain was felt to be non-cardiac. He was given medications and released (Tr. 453-58).

On December 7, 2010, State agency psychologist Gary E. Calhoun, Ph.D., opined that the plaintiff had no severe psychological impairment, no limitation in activities

7

of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation (Tr. 461-73). Also on December 7th, Dale Van Slooten, M.D., a State agency medical consultant, completed a physical residual functional capacity ("RFC") assessment. He found that the plaintiff was capable of lifting 20 pounds occasionally, ten pounds frequently, standing/walking about six hours in an eight hour work day, sitting about six hours in an eight hour work day, and unlimited pushing and pulling. He stated that the plaintiff could occasionally climb ramps or stairs, never climb ladders/ropes/scaffolds, and frequently balance, stoop, kneel, crouch, and crawl. He noted that the plaintiff would need to avoid concentrated exposure to extreme heat and cold but had no other environmental restrictions. (Tr. 475-82).

On December 16, 2010, the plaintiff was seen in followup at Cardiology Consultants. He had not started Norvasc, although he had the prescription filled, and his blood pressure was sub-optimal. He also was not taking the Lisinopril as often as prescribed. He denied chest discomfort, dyspnea, or dizziness. An EKG showed sinus rhythm with evidence of inferior infarct with persistent T wave inversions inferolaterally. An electrophysiology study was recommended (Tr. 483-485). The plaintiff was seen by Dr. Lopez on February 8, 2011. He reported another syncopal episode, though he had been compliant with medications (Tr. 487-88).

The plaintiff was admitted to Spartanburg Regional from March 1, 2011, to March 2, 2011, for an electrophysiologic study. He was found to have ventricular tachycardia, and an implantable cardioverter defibrillator ("ICD") was implanted by John J. Gallagher, M.D. (Tr. 493-94, 497-500). Following the procedure, his pacing and sensing were appropriate (Tr. 500), and he denied chest pain or any other discomfort, ranking his pain a "0" on a scale of "0" (least pain) to "10" (most pain) (Tr. 511). The next day, an x-ray of the plaintiff's chest revealed no acute abnormality (Tr. 544).

8

On June 14, 2011, the plaintiff followed up with Dr. Gallagher. It was noted that the ICD had fired once since implantation due to a ventricular fibrillation. Dr. Gallagher noted, "He has not had any further spontaneous attacks, but really is quite sedentary." His beta blocker dose was adjusted for the rhythm problems. Dr. Gallagher also noted that the ICD was implanted for serious heart rhythm problems, and the plaintiff could not perform "strenuous activity" (Tr. 557-60).

On September 15, 2011, the plaintiff returned to Dr. Gallagher at Cardiology Consultants. He had no clinical recurrence, no chest pain, and no symptoms of failure. EKG showed atrial pacing, intrinsic QRS conduction, and some atrial enlargement. His blood pressure had significantly improved; Dr. Gallagher found that his hypertension was controlled. The plaintiff's physical examination was unremarkable. Dr. Gallagher instructed the plaintiff to continue his current therapy and return in one year (Tr. 553-55).

On April 17, 2012, Dr. Gallagher issued an opinion regarding the plaintiff's functional capacity. He stated that the plaintiff has class II ischemic cardiomyopathy. He has symptoms of fatigue, weakness, and palpitations. His symptoms frequently would interfere with the attention and concentration required to perform even simple work tasks. He could sit about four hours in an eight hour work day and stand/walk less than two hours in an eight hour work day. He would need unscheduled breaks and would need to shift positions at will during the day. He could occasionally lift ten pounds and rarely lift 20 pounds. Dr. Gallagher opined that these restrictions had been present since June 2010 (Tr. 576-77).

At the administrative hearing, the plaintiff testified that he is unable to work because he tires quickly. He could walk about a mile and a half during the day, but then he must rest for a couple of hours. It was hard for him to sleep at night. He became fatigued when cleaning up – he could wash dishes and then had to sit down. He had shortness of breath when walking. During the day, he walked, visited neighbors, and did

housework, such as mopping, making the bed, sweeping, and vacuuming. The plaintiff could do those chores for only about 15 or 20 minutes, and then he has to stop due to shortness of breath. The doctor told him that he should only lift ten to 15 pounds due to his defibrillator, and he should not eat greasy food. He stated that he discussed looking for a job with his doctor, and he was told not to think about it. Since the defibrillator was put in, he had "slightly" more "passing out" episodes. Once he was watching TV and was out for maybe fifteen minutes. He still had dizzy spells, but did know what brought them on. He could go to the grocery store and cook, but his main problem was that he became short of breath when he was up and around and when he bent over (Tr. 69-76).

The ALJ asked the vocational expert at the administrative hearing whether there were any jobs in the national economy that a hypothetical individual with the plaintiff's age, education, work experience, and RFC could perform (Tr. 27). The expert testified that, given all of these factors, that individual could perform the representative occupations of cashier and surveillance systems monitor (Tr. 27, 89-91). Based on this testimony, the ALJ found that the plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy (Tr. 27).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to assign proper weight to the opinion of his treating physician; (2) failing to make a proper credibility determination; and (3) failing to find that he was disabled under the Medical-Vocational Guidelines.

### *Treating Physician*

The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with

which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The plaintiff argues that the ALJ improperly rejected the opinion of Dr. Gallagher, his treating cardiologist (pl. brief at 9-11). The ALJ gave Dr. Gallagher's opinion "partial weight." Although the ALJ recognized that Dr. Gallagher treated the plaintiff, the ALJ explained that he would not give Dr. Gallagher's opinion controlling weight because it was not consistent with the medical records, which reflected significant improvements in the plaintiff's condition. Additionally, the ALJ observed that the plaintiff consistently denied

11

having symptoms, and his physical examinations were unremarkable. Moreover, the ALJ noted that Dr. Gallagher imposed greater restrictions on the plaintiff's abilities than the plaintiff alleged at the hearing (Tr. 26).

Substantial evidence support the ALJ's finding giving Dr. Gallagher's opinion partial weight. After his June 2010 heart attack, the plaintiff's renal function improved remarkably (Tr. 260, 425); his ejection fraction increased to 40% to 45% (Tr. 260, 425); an August 2010 spirometry report revealed normal results (Tr. 251, 416); a September 2010 echocardiogram showed that, although the plaintiff had severe inferior wall hypokinesis, he continued to improve from his condition (Tr. 274); Holter monitoring in September 2010 showed frequent premature ventricular contractions (Tr. 272, 428), but the plaintiff's intermittent atypical chest pain was not associated with dysrhythmia, he never had pauses more than 1.6 seconds, his QRS was normal, he did not have sustained arrhythmia, and his minimum heart rate was considered physiologic (Tr. 432); the plaintiff's heart exam in October 2010 revealed a regular rhythm, normal apex impulse location, and normal heart sounds (Tr. 433); a CT scan in October 2010 revealed that the plaintiff's lungs were essentially clear with only some minor opacity anterior to the left hilum (of little clinical significance) with pleural effusions resolved (Tr. 420, 451); and, following the implantation of a defibrillator in March 2011, an x-ray of the plaintiff's chest revealed no acute abnormality (Tr. 544). In addition, as noted by the ALJ, Dr. Gallagher's opinion conflicts with the plaintiff's physical examination results following his heart attack, which were generally unremarkable (Tr. 416, 419-20, 433, 483-84, 553-54, 558-59). Dr. Gallagher's own progress notes indicate that, as of September 2011, the plaintiff had no recurrences clinically, no chest pain, no symptoms of failure, and that his blood pressure had significantly improved—so much so that the plaintiff's hypertension was, in Dr. Gallagher's words, "controlled" (Tr. 553-54).

Further, as the ALJ found (Tr. 26), Dr. Gallagher's opinion suggested greater restrictions than even the plaintiff alleged at the administrative hearing and in his self-reports. For example, although Dr. Gallagher stated that the plaintiff's cardiac symptoms would frequently interfere with his ability to concentrate (Tr. 576), the plaintiff acknowledged that he had no problems paying attention and was able to follow instructions (Tr. 204-05, 225). The plaintiff testified at the hearing that his medication controlled his hypertension and that he was able to perform a wide range of daily living activities, including mopping, making his bed, doing the laundry, sweeping the floor, vacuuming, going grocery shopping, cooking for himself, going on walks for up to a mile and a half, visiting neighbors, and attending church several times a week (Tr. 67, 69, 70-71, 75-76; *see also* Tr. 201-03). This evidence is inconsistent with Dr. Gallagher's opinion.

The plaintiff contends that the ALJ was "not entirely correct" in finding that his condition improved after his heart attack in June 2010, noting that he had a fainting episode and eventually underwent a defibrillator implantation (pl. brief at 10-11). However, as argued by the Commissioner, while it is clear that the plaintiff still suffered from a heart condition (as evidenced by his fainting episode and defibrillator), the ALJ was nevertheless correct in noting that the plaintiff's condition improved after his June 2010 heart attack as discussed above.

In the RFC assessment, the ALJ also considered the opinion of State agency medical consultant Dr. Van Slooten (Tr. 25-26 (citing Tr. 475-82)). The ALJ gave the opinion "some weight" and found that the record supported Dr. Van Slooten's opinion that the plaintiff could perform light work with frequent balancing, stooping, kneeling, crouching, and crawling; occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; and avoidance of exposure to extreme temperatures (Tr. 25). However, the ALJ did not adopt Dr. Van Slooten's opinion in its entirety. Rather, the ALJ afforded the plaintiff

the benefit of the doubt and included greater restrictions than Dr. Van Slooten proposed, given the ALJ's evaluation of the record (Tr. 25).

The plaintiff argues that the ALJ erred by assigning weight to Dr. Van Slooten's RFC assessment because he issued that opinion before the plaintiff's defibrillator implantation (pl. brief at 11).  However, in evaluating Dr. Van Slooten's opinion, the ALJ reviewed all of the medical records—including the records from the plaintiff's defibrillator procedure—and found that Dr. Van Slooten's opinion accurately reflected the entire range of objective medical evidence (Tr. 25). *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical . . . consultants . . . are highly qualified physicians . . . who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical . . . consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See also* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir.1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Based upon the foregoing, the undersigned finds that the ALJ properly weighed the medical opinion evidence, and his findings are supported by substantial evidence.  Accordingly, this allegation of error fails.

*Credibility*

The plaintiff next argues that the ALJ failed to make a proper credibility determination (pl. brief at 11-12). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are

15

> inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

16

>    (1)   the individual's daily activities;
>
>    (2)   the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
>    (3)   factors that precipitate and aggravate the symptoms;
>
>    (4)   the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
>    (5)   treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
>    (6)   any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
>    (7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ recognized that the plaintiff's medically-determinable impairments could reasonably be expected to cause his alleged symptoms, but found that the plaintiff's statements about the intensity, persistence, and limiting effects of those symptoms were not entirely credible (Tr. 25).  The ALJ noted that the plaintiff's condition improved with treatment since his heart attack in June 2010 (Tr. 24-25).  The ALJ noted that although the plaintiff complained about night sweats, chest pains, dizziness, shortness of breath, and other related symptoms, he stopped reporting these symptoms to his health care providers in late 2010, which undermined his credibility on this point (Tr. 25; *see* Tr. 483, 511, 553). The plaintiff argues that the ALJ erred in this finding because he reported a syncopal episode to Dr. Lopez in February 2011, which led to his defibrillator implantation (pl. brief at 12 (citing Tr. 488)).  The ALJ specifically considered the plaintiff's episode of syncope (i.e., fainting) in early 2011 and the subsequent implantation of a cardiac defibrillator (Tr. 25).  However, the plaintiff does not cite – and the undersigned has not found – evidence

17

in the record contradicting the ALJ's finding that the plaintiff had not complained of the cited symptoms (night sweats, chest pain, dizziness, diarrhea, swelling of hands/feet, shortness of breath, difficulty completing tasks, deficits in memory and concentration) since late 2010. Moreover, the ALJ noted that the plaintiff's physicians did not include the cited symptoms in their treatment notes since late 2010. In addition, although the plaintiff had reported financial difficulty obtaining medication, there also was evidence that he failed to take medication that he did have in accordance with his physicians' directives (Tr. 25; *see* Tr. 483-85). Further, the ALJ found that the plaintiff's allegations about being too tired to work were inconsistent with his wide range of self-reported daily activities. There also was no evidence of any symptoms stemming from his hepatitis C and liver disease, notwithstanding his inclusion of these conditions as a basis for his alleged disability. Taken together, the ALJ found that these aspects of the record undermined the plaintiff's allegations about the severity of his symptoms (Tr. 25). The undersigned sees no error in the ALJ's assessment of the plaintiff's credibility, and substantial evidence supports the ALJ's findings. Accordingly, this allegation of error fails.

***Medical-Vocational Guidelines***

Lastly, the plaintiff argues that he should be found disabled under Rule 201.09 of the Medical-Vocational Guidelines because the record shows he is limited to sedentary work (pl. brief at 12-13). The Medical-Vocational Guidelines "contain numbered table rules which direct conclusions of 'Disabled' or 'Not disabled' where all of the individual findings coincide with those of a numbered rule." SSR 83-12, 1983 WL 31253, at *1. However, the table rules do not direct conclusions of disabled or not disabled "when an individual's exertional RFC does not coincide with the exertional criteria of any one of the external ranges, i.e., sedentary, light, and medium." *Id*. To the extent the erosion of the occupational base is not clear, the ALJ should consult a vocational expert. *Id*. at *2.

Here, the ALJ found that the plaintiff was limited to light work with a number of additional restrictions (Tr. 23). The ALJ explained that, if the plaintiff had the RFC to perform the full range of light work, Medical-Vocational Rule 202.10 would direct a finding of "not disabled" (Tr. 27). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.10. However, because the ALJ found additional limitations on the plaintiff's ability to perform light work, the ALJ consulted a vocational expert to determine whether jobs existed in the national economy for an individual with the plaintiff's age, education, work experience, and RFC (Tr. 27). Relying on the vocational expert's testimony that there were such jobs in the economy, the ALJ found that the plaintiff was not disabled (Tr. 27). While the plaintiff contends that he should have been found disabled pursuant to Rule 201.09, that rule directs a finding of "disabled" only for individuals who, among other things, are limited to a sedentary level of exertion. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.09. As the ALJ found that the plaintiff could perform light work (with additional restrictions), as opposed to sedentary work, and substantial evidence supports that finding as discussed above, this allegation of error fails.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald  
United States Magistrate Judge

January 15, 2015  
Greenville, South Carolina